UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

JOSEPH VERMEAL          )
                               )    No.  4:08-cv-59
v.                       )
                               )    Judge Mattice
TONY PARKER,  WARDEN     )

## <u>MEMORANDUM AND ORDER</u>

This is a *pro se* petition for the writ of habeas corpus brought pursuant to 28 U.S.C.

§ 2254 by Joseph Vermeal ("Petitioner")  (Court Doc.  1).  Petitioner is a prisoner confined

at Northwest Correctional Facility in Tiptonville, Tennessee.  Respondent Tony Parker

("Respondent"), Warden of the facility where Vermeal is housed, filed a Motion for

Summary Judgment (Court Doc. 7), and Petitioner filed a response.  (Court Doc. 10).

After considering the filings of Respondent and Petitioner, the record of the state

proceedings, and the applicable law, and for the reasons explained below, the Court will

**GRANT** Respondent's Motion for Summary Judgment (Court Doc. 7) and will **DISMISS**

Petitioner's § 2254 petition (Court Doc. 1).

## I.    STANDARD OF REVIEW

A state criminal defendant may obtain federal habeas relief if he can demonstrate

he is in custody pursuant to the judgment of a state court in violation of the Constitution or

laws or treaties of the United States.  28 U.S.C. § 2254.  Under Rule 8 of the Rules

Governing Section 2254 Proceedings in the United States District Courts, the Court is to

determine - after a review of the response, the transcript, record of state court proceedings,

and the expanded record - whether an evidentiary hearing is required.  If a hearing is not

1

required, the district judge may dispose of the case as justice dictates. After carefully reviewing the appropriate documentary materials, the Court finds it unnecessary to hold an evidentiary hearing.

Federal courts review decisions of the state courts pursuant to 28 U.S.C. § 2254(d), a part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This statute limits the scope of a federal district court's jurisdiction to review habeas claims on the merits. In particular, a court considering a habeas claim must defer to any decision by a state court concerning the claim unless the state court's judgment (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1) and (2). Factual findings made by state courts are presumed correct unless rebutted by clear and convincing evidence offered by petitioner. 28 U.S.C. § 2254(e)(1). Credibility findings made by state courts are entitled to the presumption of correctness. *McQueen v. Scroggy,* 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied,* 520 U.S. 1257 (1997), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004); *Smith v. Jago,* 888 F.2d 399, 407 (6th Cir. 1989), *cert. denied,* 495 U.S. 961 (1990).

## II.  PROCEDURAL HISTORY

In 2003, Petitioner was convicted by a jury in case F-8351 of aggravated sexual battery of a child under 13 (Addendum No. I, Vol. III, p. 232). The following year Petitioner was convicted by a jury in case F-8404 of attempted aggravated sexual battery of a child

2

under 13 (Addendum No. II, Vol. III, p. 270).[1]  Both convictions were affirmed by the Tennessee Court of Criminal Appeals on direct appeal.  *See State v. Joseph Vermeal*, No. M2004-00046-CCA-R3-CD, 2005 WL 1000237 (Tenn. Crim. App.  April 29, 2005); *State v. Joseph Vermeal*, No. M2005-00568-CCA-R3-CD, 2005 WL 3543417 (Tenn.Crim.App. Dec. 28, 2005).[2]  The main focus of both appeals was on the trial court's exclusion of Petitioner's proffered expert witness' testimony about acceptable interviewing techniques of children.

Petitioner filed two state post-conviction petitions challenging his trial counsel's representation and after the trial court denied both petitions, the Tennessee Court of Criminal Appeals consolidated them for appeal and rejected all of Petitioner's challenges. *See Joseph Vermeal v. State*, No. M2007-01676-CCA-R3-PC, 2008 WL 2648939 (Tenn.Crim.App. July 3, 2008).  Petitioner now petitions this Court for review of his convictions.  He bases his request for relief on claims of ineffective assistance of counsel and a claim that he was denied a fair trial because the trial court excluded his proffer of an expert witness on the subject of professionally acceptable interviewing techniques of children.  In support of the latter issue, Petitioner contends, that in light of the decision in *State v. Copeland*, 226 S.W.3d 287 (Tenn. 2007), which overruled *State v. Coley*, 32

---

[1]      "Petitioner testified that Lisa Zavogiannis represented him in *Vermeal I*. His first trial resulted in a hung jury, but a jury convicted him after a re-trial." *Vermeal v. State*, No. M2007-01676-CCA-R3-PC, 2008 WL 2648939 (Tenn. Crim. App. July 3, 2008).  Attorney Clemons assisted in Petitioner's defense in *Vermeal I* and was subsequently appointed to represent Petitioner in *Vermeal II.*

[2]      Both convictions are based on incidents that occurred on August 26, 2000, in Petitioner's residence following a block party sponsored by Pioneer Community Baptist Church.

S.W.3d 831 (Tenn. 2000), a case precluding reliance on expert testimony regarding eye witness identification and the case upon which the trial court in Petitioner's case relied when it denied his expert's testimony, he is entitled to a new trial.

III. **FACTUAL BACKGROUND**[3]

Petitioner, a fifty-year old single man, was a maintenance employee and resident at the Country Place Apartments when this incident occurred. On August 26, 2000, a church-sponsored block party was held in the parking lot of County Place Apartments. Petitioner, who was observed drinking beer during the party, attended. The victims, as well as other apartment residents, also attended the block party [Addendum No. I, Vol. II, pp. 81-.85]. After the party, several children were riding their bikes when one of the children suggested they could obtain ice cream at Petitioner's apartment. The children went to Petitioner's apartment, asked him for ice-cream, and he gave them permission to get popsicles from his freezer and instructed them to eat them on his porch. They did so, and afterward, the Petitioner invited the children into his apartment to watch cartoons. J.P.,[4] watched one cartoon and then went into Petitioner's bedroom to jump on his waterbed [Addendum II, No. II, pp. 82-91].

Eventually all of the children, except the two female victims, N.O. and J.P., left Petitioner's apartment. According to N.O.'s testimony, while J.P. was in Petitioner's bedroom jumping on the waterbed, N.O. was standing by the front door looking outside

---

[3] The facts of this case, which come from two different trials, are found in Addendum No. I, Vol. II and Addendum No. II, Vol. II.

[4] The Court identifies minor sexual abuse victims by their initials. J.P. and N.O. were seven or eight years old when this occurred.

when she felt someone touch her right buttock.  N.O. thought it was J.P. but when she turned around she saw Petitioner.  Petitioner then slid his hand underneath her shirt and touched her breasts.  Petitioner then removed his hand, retrieved a beer from the kitchen, and returned to his bedroom.

Although there is a slight variation in N.O.' s testimony at the two trials as to what happened next, it appears that N.O. went outside briefly and then returned to Petitioner's apartment.  When she looked in the bedroom, she saw Petitioner, who had no pants or underwear on, take off J.P.'s pants and underwear,  and saw Petitioner "had his, um, private part to her private part." [Addendum No. II, Vol. II, pp. 96-100].  N.O. then went outside to ride her bike.  N.O. explained that she was scared and surprised that J.P. was not fighting, but she just kept it to herself.  She rode her bike about ten minutes and then her uncle stopped her and told her to go get her father.  They went to her house and her uncle told her father that one of his friends had seen her in Petitioner's apartment.   Her father went to Petitioner's apartment, and while he was gone, N.O. told her uncle's friend and his wife that Petitioner had touched her.  Soon thereafter, N.O.'s father and Petitioner got into a fight, and Petitioner was taken from the scene in an ambulance.

When her father returned home, he asked N.O. a few questions.  The police were called and they took N.O. to the Department of Children's Services ("DCS") to speak with Ms. Melba Mooneyham, a DCS caseworker, about what had occurred at Petitioner's apartment [Addendum No. II, Vol. II, pp. 91-101].

According to J.P.'s testimony, she and N.O. were jumping on Petitioner's bed and when Petitioner came into the bedroom, N.O. left.  Petitioner tripped J.P. on the bed and took his pants off and her pants and panties off and stuck his private part into her private

5

part [Addendum No. I, Vol. II, pp. 139-150].

IV. **ANALYSIS**

In challenging his convictions for aggravated sexual battery of J.P. and attempted aggravated sexual battery of N.O., Petitioner raises the same four claims he raised in his state post-conviction proceedings. Petitioner claims that he was denied a fair trial because the trial court excluded his proffered expert testimony on professionally acceptable interviewing techniques of children based on a state court decision which was subsequently overruled. In addition, Petitioner challenges trial counsel's reliance on diagrams of his apartment and failure to impeach the victim with her grand jury testimony in the trial of J.P.'s case. Petitioner claims that counsel in the N.O. case failed to confer sufficiently with him; failed to object to the State's reliance on leading questions to elicit the child victim's testimony; introduced potentially inculpatory evidence; and failed to call two witnesses.

A. **Evidentiary Ruling—Exclusion of Expert Testimony**

Petitioner contends the trial court erred in excluding the testimony of his expert witness who would have testified on the subject of professionally acceptable interview techniques of children. Petitioner contends that the trial court based its decision to exclude the expert's testimony on *State v. Coley*, 32 S.W.3d 831 (Tenn. 2000) (precluding reliance on expert testimony regarding eye-witness identification), and further contends that because the Tennessee Supreme Court in *State v. Copeland*, 226 S.W.3d 287 (Tenn. 2007) (finding error where trial court prohibited expert testimony on reliability of eyewitness identification) overruled *Coley* which, in effect, permits experts to testify about the

6

unreliability of eye-witness accounts, he is entitled to habeas relief. *See Copeland,* 226 S.W.3d at 300.

During Petitioner's trial, he unsuccessfully sought to present expert testimony on the subject of appropriate methods for interviewing children. Petitioner made an offer of proof outside the presence of the jury, presenting Dr. William Bernet, Director of Vanderbilt Forensic Psychiatry and a professor in the Department of Psychiatry at Vanderbilt University School of Medicine. His expertise was conceded by the prosecution [Addendum No. I, Vol. II, pp. 47].

Dr. Bernet authored an article addressing the procedures to be followed when investigating children who have been abused. The article covers the proper methodology to be used when conducting such an investigation and provides a step-by-step approach which is the standard procedure adopted by the American Academy of Child and Adolescent Psychiatry. Dr. Bernet believes that the procedure is beyond the knowledge of a lay person but it is something a psychiatric or psychological professional would know [Addendum No. I, Vol. II, pp. 45-49].

Dr. Bernet also wrote an article entitled, "False Statements and Differential Diagnosis of Abuse Allegations," which explains different psychological mechanisms by which children make false statements, especially false statements of abuse. According to Dr. Bernet, this too is a topic beyond the knowledge of a lay person.

Dr. Bernet asserted that he had testified as an expert witness regarding child sexual abuse in criminal cases. In the instant case, he reviewed the videotape of Petitioner's interrogation by the investigators and personally interviewed Petitioner. He also reviewed "material related to [J.P.]. . . and specifically, [he] reviewed the interview of [J.P.] with Ms.

7

Mooneyham who was the DCS worker . . . on the day of the alleged offense on August 26, 2000[,] . . . the assessment of [J.P.] that took place at Our Kids Center on August 27, 2000[,] . . . [and] the transcript of the preliminary hearing that had [J.P.'s] testimony on October 5, 2000[,] . . ." [Addendum No. I, Vol. II, pp. 52-53].   Dr. Bernet also reviewed the interview of N.O. by Mooneyham on August 26, 2000; the videotape of an interview of N.O.; a transcript of an interview with the judge that took place on December 4, 2000; and a December 2, 2002 transcript of *State v. Vermeal*. [Addendum No. I, Vol. II, p. 53].

Had he been permitted to testify, Dr. Bernet had planned to address three issues. He anticipated testifying about the proper methods for interviewing children when investigating allegations of mistreatment; the various psychological mechanisms by which false statements are made by children; and the factors consistent with true allegations of abuse and those consistent with false allegations [Addendum No. I, Vol. II, p. 54].

Specifically, Dr. Bernet would have explained that it is imperative to avoid suggestive, leading, or repetitive questions when interviewing children during a sexual abuse investigation.  Further, Dr. Bernet opined that the interview by Ms. Mooneyham of J.P. included "some suggestive and repetitive questions" which he believed influenced J.P.'s answers.

Second, Dr. Bernet would have explained that during these types of interviews, children should be encouraged to make a free narrative statement.  This is accomplished by asking them to tell the interviewer everything that happened and prompting the interviewee to tell what happened next without asking a series of suggestive questions— something which, he asserted, did not happen in this case [Addendum No. I., Vol. II, p. 55].

8

Dr. Bernet explained that it was very important to have a thorough understanding of what the child has said on all occasions. Specifically, it is important to know what the child said initially and the contents of each subsequent revelation. In addition, it is important to determine the source of any emotion exhibited by the child during the interview.

Dr. Bernet explained that there are many different ways to influence a child to make a statement that is false. It was Dr. Bernet's opinion that parental misinterpretation and suggestion (*i.e.,* where a parent has the wrong information or misinterprets the information and then begins questioning the child in such a way that the child was induced to make statements) played a role in this case. In addition, it was Dr. Bernet's opinion that Ms. Mooneyham asked suggestive questions which prompted the child to endorse the suggestions. Dr. Bernet gave the following example:

> [T]here were situations where Ms. Mooneyham said, Well, what did he say at that point? Well, the child or nobody had actually brought up -- the child hadn't brought up that he said anything. So the child hadn't brought up anybody saying anything at that point but Ms. Mooneyham said, Well, what did he say? Which implies to the child, Un-oh, I have to now tell this interviewer something he said. And another example had to do with [sic] Ms. Mooneyham brought up, Do you know what drugs are? And that lead [sic] to a discussion of there being drugs or him actually smoking the joint of marijuana and that was something she brought up out of the clear blue sky without the child saying anything about that and she brought up about liquor being present and about pornographic videos being present and other things. In other words, these are things the child didn't bring up but she brought up and she did this instead of trying to get the child - - there was no attempt at all made to try to get the child to make a free narrative statement.

[Addendum No. I, Vol. II, pp. 57-58].

Dr. Bernet also explained that a child's misinterpretation of an act may influence her to make a false statement. Misinterpretation on a child's part occurs when something

9

innocent happens, as when someone pats a child on the back or bottom and it is misinterpreted as something sexual. In addition, there is confabulation. Confabulation occurs when a person is asked a question, feels as if he is being put on the spot, does not know or remember the answer, and spontaneously makes up an answer. Dr. Bernet observed that J.P.'s statement about a knife, marijuana, and liquor appeared to be confabulation "on her part or at least they could have been." [Addendum No. I, Vol. II, p. 58].[5]

Dr. Bernet also explained that children sometimes engage in "innocent lying." This type of falsehood means the child knows she is not telling the truth but she is doing it for what she perceives as a good reason, but fails to realize the horrible implications in certain situations of not telling the truth. For instance, a child will engage in this behavior when she feels that she is in trouble or has done something wrong and, when questioned, she deflects the blame by accusing somebody else of wrongdoing. It was Dr. Bernet's opinion that this might have occurred in this situation because the girls did not have their parents' permission to go into Petitioner's residence. The girls realized that they were in trouble and later made the accusations which might have been made to protect themselves.

The last factor Dr. Bernet discussed was a mechanism called "group contagion." Group contagion is a situation where people in the community hear a rumor and pass it around as a truthful fact. As an illustration, there was a rumor that Petitioner "was a pervert and sometimes adults can leap to the conclusion that is true and then they start asking questions and it spreads and it takes on a life of its own." [Addendum No. I, Vol. II, p. 59].

---

[5] J.P. subsequently admitted her statements about a knife, marijuana, and liquor were untrue.

Dr. Bernet then explained that there were factors consistent with true and false allegations. The fact that J.P. at some point actually made a statement that she was abused or molested by Petitioner and the fact that more than one child said they were molested by Petitioner weighs on the side of a true allegation. On the other hand, Dr. Bernet explained that several factors in this case were consistent with false allegations.

One is that [J.P.] knew that people, that the adults, were saying negative things about [Petitioner]. For instance, at the beginning of her interview with Ms. Mooneyham she refers to [Petitioner] as the bugger [sic] man and as a bad person and that he raped a boy. In other words, she knew and it's clear that adults have told her bad things about [Petitioner] and in fact, in the interview itself Ms. Mooneyham reinforces that [Petitioner] is a bad person. In the interview Ms. Mooneyham talks about [Petitioner] being in jail, having to go to jail so that reinforces in [J.P.] the notion that, oh, people in the community that I know, these grownups are all down on [Petitioner] and she would have a tendency to join with the grownups in that view. My point is when that aspect is present, that raises the possibility of her adopting a false statement.

There is [sic] some other things. I think I mentioned this, that she may have thought she was in trouble for going to [Petitioner's] house without permission. She never provided a free narrative account but only responded to suggestive questioning. Other things that she described are not consistent really with what pedophiles do. For instance, pedophiles make efforts to avoid discovery and the way she related it that wasn't the case. In fact, she even related that N.O. was present when [Petitioner] was supposedly abusing her and that's not typical perpetrator behavior. There is other perpetrator behavior that she did not describe, for instance, grooming. You know, typically pedophiles become friends with children over a period of time and then gradually do things to them and that's not something [J.P.] described. She described some things that might be implausible, like the thing about threatening her with a knife and the marijuana and giving her liquor and so on. She used adult language rather than child language. For instance, she reportedly said that [Petitioner] raped her and that's, you know, that's an adult word rather than a eight or seven year old word and finally she's given different accounts on different occasions that what she told Ms. Mooneyham was really different from what she told at Our Kids and that was different from what she stated when she was at the hearings and so that's a problematic thing when children say different things, greatly, tremendously different things on different occasions.

11

[Addendum No. 1, Vol. II, pp. 61-62].

On cross-examination, Dr. Bernet explained that he did not believe an average person knows the proper methodology for conducting this kind of interview. He testified that he did not believe the average juror understands that, simply by asking a child a leading question, the child can be induced to agree and then take that on as her belief.[6] When questioned about the research he had conducted, Dr. Bernet stated he was familiar with the research that many people have done on interview techniques. Dr. Bernet also acknowledged that the paper which he authored on the procedures to use to conduct child interviews specified "[t]hese criteria for assessing credibility have been based on clinical experience and limited preliminary research. They should not be taken to be infallible and should not be misunderstood or misued." [Addendum No. I, Vol. II, p. 68]. However, he also testified that "there is almost uniform agreement about proper methodology for interviewing children and the whole idea of trying to get the child to have a free narrative rather than asking a series of suggestive questions. As far as I know that's adopted by every major professional group that deals with these children. As far as I know there is not any debate about that." [Addendum No. I, Vol. II, pp. 70-71].

After hearing the proffered testimony, the trial court concluded (1) the jury did not need an expert to tell them that if they ask a child a leading question, it tends to imply the answer; (2) that adult language indicates someone told them what to say or they heard it from an adult; and, finally, (3) that the doctor's testimony would not substantially assist the trier of fact in determining a fact at issue.

---

[6]     It is certainly common knowledge in the legal field, because attorneys use the identical technique on adverse witnesses as a matter of standard technique.

12

On direct review, the Court of Criminal Appeals of Tennessee concluded the evidence was properly excluded under the rule in *State v. Coley*, 32 S.W.3d 831, 835 (Tenn. 2000) which prohibited expert testimony on the reliability of eyewitness testimony, finding that such testimony was of a general nature designed to affect the juror's decision on the credibility of witnesses. Additionally, the Court concluded Dr. Bernet's testimony was geared toward assessing the credibility of child witnesses, whereas the assessment of witness credibility properly rests within the province of the jury. *State v. Vermeal*, 2005 WL 3543417, *6 (Tenn. Crim. App. Dec. 28, 2005); *State v. Vermeal*, 2005 WL 1000237, * 7 (Tenn. Crim. App. April 29, 2005).

On appeal of the denial of his state post-conviction petition, Petitioner asserted that because *Copeland* overruled *Coley*—the case used by the trial court and direct appeals court to exclude his expert testimony—his due process right to a fair trial was violated when his expert was excluded.[7] Concluding *Copeland* was not retroactively applicable to Petitioner's case because it was an evidentiary issue and not a constitutional issue, the appellate court denied him relief. Since state courts have the final say on the retroactive operation of their own interpretations of state law, *see Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 100 (1993), the retroactivity of *Copeland* is not a cognizable claim in this habeas proceeding. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the

---

[7] *Copeland* was decided eight days before Petitioner's post-conviction hearing. Recognizing that Petitioner's state post-conviction petition would be unlikely to contain a *Copeland* argument, as *Copeland* had not yet been decided, the appellate court noted the post-conviction attorney failed to raise the issue at the hearing, thus risking waiver of the *Copeland* issue. Despite the risk of waiver, the appellate court analyzed the *Copeland* issue. *Vermeal v. State,* No. M2007-01676-CCA-R3-PC, 2008 WL 2648939, *7-8 (Tenn.Crim.App. July 3, 2008).

13

province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("federal habeas corpus relief does not lie for errors of state law.").

By the same token, federal habeas relief of state court evidentiary rulings is extremely limited. *Waters v. Kassulke*, 916 F.2d 329, 335 (6th Cir. 1990). This is so because evidentiary rulings generally do not rise to a constitutional level unless the error was so prejudicial as to deprive a defendant of a fundamentally fair trial, thus violating due process. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983). A habeas court confronted with a claim that the exclusion of evidence has denied a defendant of his fundamental due process rights should consider the extent to which the evidence is "critical" to the case, whether it "tend[s] to exculpate" the accused, and whether the evidence bears "persuasive assurances of trustworthiness." *Turpin v. Kassulke*, 26 F.3d 1392, 1396 (6th Cir. 1994) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 297, 302 (1973).

To the extent Petitioner claims he was denied a fundamentally fair trial by the exclusion of Dr. Bernet's testimony, the claim is cognizable in this habeas proceeding. Nevertheless, the state court's decision is binding on this Court unless that decision is contrary to or involves an unreasonable application of clearly established federal law as determined by the United States Supreme Court. To meet that criteria, Petitioner must demonstrate the trial court's exclusion of his expert's testimony on the proper protocol in interviewing children who are suspected victims of sexual abuse denied him a fundamentally fair trial.

The trial court entered an order granting the prosecution's motion *in limine* to exclude Dr. William Bernet upon its findings that his proffered testimony did not meet the standards of reliability set forth in *McDaniel v. CSX Transportation, Inc.* 955 S.W.2d 257 (Tenn. 1997), and would not substantially assist the trier of fact to understand the evidence or determine a fact in issue, as required by Rule 702 of the Tennessee Rules of Evidence. In addition, the court found there was no proof that the proffered evidence is generally accepted in the scientific community.

Petitioner asserts he was denied due process, the right to present a defense, and a fundamentally fair trial because the state trial court refused to permit Dr. Bernet to challenge the interview protocol used when interviewing the minor victims in this case. Although the Court questions whether *all* of Dr. Bernet's testimony should have been excluded, this Court will not decide whether the state trial court's evidentiary ruling was correct. Rather, it will determine whether the ruling denied Petitioner a constitutionally-guaranteed right to a fair trial.

Although a defendant's right to call witnesses to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment, *see Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988), the right is not unlimited. That right is counterbalanced against the requirement that a defendant comply "with established rules of procedure and evidence designed to assure both fairness and reliability." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). For example, "expert testimony is limited by the requirements of relevancy and by the trial court's traditional

15

discretion to prevent prejudicial or confusing testimony." *Agard v. Portuondo*, 117 F.3d 696, 705 (2nd Cir. 1997). Thus, when determining whether the exclusion of evidence denied a defendant a fundamentally fair trial, the court considers the extent to which the evidence is "critical" to the case, whether it "tend[s] to exculpate" the accused, and whether the evidence bears "persuasive assurances of trustworthiness." *Turpin v. Kassulke*, 26 F.3d 1392, 1396 (6th Cir. 1994) (quoting *Chambers v. Mississippi*, 410 U.S. at 297, 302). Furthermore, the Court is mindful that it is within the trial court's discretion to exclude expert testimony.

The Supreme Court of the United States has determined that the exclusion of evidence in certain cases amounts to a constitutional violation. *See Taylor v. Illinois*, 484 U.S. at 408-414 (rejecting defendant's argument that under the Compulsory Process Clause of the Sixth Amendment, "preclusion is *never* a permissible sanction for a discovery violation.") (emphasis in original); *Rock v. Arkansas*, 483 U.S. 44, 47-57 (1987) (finding unconstitutional the exclusion of defendant's hypnotically refreshed testimony because it deprived the jury of the testimony of the only witness who was at the scene and had first-hand knowledge of the facts and denied defendant the right to testify); *Washington v. Texas*, 388 U.S. 14, 16-17 (1967) (finding it unconstitutional to prevent a codefendant from testifying that he had in fact committed the crime); and *Chambers v. Mississippi*, 410 U.S. at 294-302) (due process was violated by Mississippi's common-law "voucher rule," which prevented a party from impeaching his own witness to show the witness had actually committed the crime, and its hearsay rule which excluded the testimony of three people to whom the witness had confessed he committed the crime). The exclusion of evidence

16

declared unconstitutional in those cases significantly undermined fundamental elements of the defendant's defense. In those cases, the defendants were prevented from introducing factual evidence. In Petitioner's case, he was merely prevented from introducing opinion evidence to attack the victims' credibility.

Had Petitioner been prevented from introducing testimony that the girls were never alone with him in his apartment or some other evidence tending to show he was innocent, then the Court would be addressing a legitimate due process claim concerning the denial of the right to present a defense. Excluding Dr. Bernet's testimony involving the credibility of the victims' statements, however, particularly given that credibility determinations are the core function of the jury, did not deny Petitioner a fundamentally fair trial or the right to present a defense. *See Moore v. Tate*, 882 F.2d 1107 (6th Cir. 1989) (exclusion of expert testimony on reliability of eyewitness identification did not amount to denial of a fair trial); *Washington v. Schriver*, 240 F.3d 101 (2001) (exclusion of expert testimony regarding suggestibility of young witnesses did not amount to constitutional error): *see also United States v. Smead*, 317 Fed.Appx. 457 (6th Cir. 2008), *available at*, 2008 WL 4963074 (exclusion of expert testimony regarding error-reduction procedures in photo-array identifications did not deny defendant the right to present a defense).

Petitioner was not prohibited from testifying on his own behalf; he freely exercised his choice not to convey his version of the facts to the jury. In addition, it does not appear that counsel was prohibited from presenting the testimony of the interviewers and attacking their interview techniques, as Petitioner's counsel in N.O.'s trial questioned Ms. Mooneyham about the techniques she used when interviewing N.O.

17

As detailed above, Dr. Bernet's testimony would have informed the jury of the proper methodology to be used when conducting a child sex abuse investigation. Specifically, Dr. Bernet would have testified that suggestive, leading, and repetitive questions by interviewers should be avoided. As the trial court concluded, generally, ordinary men and women are able to detect suggestibility in questioning and can evaluate the techniques used to question children. Moreover, the only evidence of the abuse was the victims' testimony; thus their credibility was the determining factor in finding Petitioner guilty. The jury was able to make its credibility assessment without Dr. Bernet's testimony because the jury saw the victims testify, observed their demeanor, and heard their answers during direct and cross examination. Therefore, the jury was sufficiently able to assess the truthfulness of their testimony without any expert assistance.

There is no doubt the victims' credibility was at issue because the victims' statements conflicted to some degree (*i.e.*, N.O. said she was not playing on the waterbed but J.P. said they were both playing on the waterbed) and they gave several different versions of what occurred. Direct examination and vigorous cross examination of the victims revealed the differences in their version of the facts and disclosed that the individual victims had told more than one version of the alleged abuse. The victims were thoroughly questioned about with whom they discussed the incident, what they told each time they discussed the abuse, the fact that, each time they told the story, the facts changed, the reasons for changing their stories, and whether they falsified the allegations of abuse because they knew they were in trouble for going into a strange man's apartment—a violation of parental rules. Although, arguably, the expert testimony was relevant and would have aided the jury, the basic idea that young children can be

18

suggestible and that asking for a narrative explanation of what happened (rather than asking leading, repetitive, or suggestive questions) is a superior method to gain a more accurate description of the facts, is not beyond the knowledge of jurors.

Additionally, Petitioner was not prohibited from questioning the interviewers and challenging their techniques. Indeed, defense did just that during the trial of charges involving N.O. Furthermore, the expert testimony was not critical to the case nor does it exculpate Petitioner, as the expert would not have testified that the victims were lying or that Petitioner was innocent. Rather he would have only testified as to the proper protocol for questioning that victims and how, in some instances that protocol was not followed when certain questions were asked of the victims in this case. In addition, he would have testified that certain factors indicate the allegations are truthful and other factors indicate the allegations are false.

Nevertheless, both victims alleged they were abused by Petitioner and both victims testified that Petitioner took off J.P.'s pants and panties and his own pants, and then he put his private part on J.P.'s private part, testimony which the expert would have testified indicated the truthfulness of the allegations.[8] For all of these reasons, the Court

---

[8] During his proffer, Dr. Bernet testified there were factors consistent with true and false allegations. The expert specifically testified that "a couple of factors consistent with true allegations in this case are that [J.P] at some point or other actually did make a statement in which she alleged being abused or molested by Mr. Vermeal and another factor that is consistent with a true allegation is that there is more than one child who had made statements, that there are two children I know about who have made statements about being molested by Mr. Vermeal so those factors would weigh on the side of a true allegation." [Addendum No. I, Vol. II, p. 60].

19

Case 4:08-cv-00059-HSM-SKL   Document 14   Filed 09/29/09   Page 19 of 41   PageID #: 100

does not find the evidence was critical or that it tends to exculpate Petitioner;[9] thus, the exclusion of the expert testimony does not rise to the magnitude of a constitutional due process violation. Therefore, since this claim is not a cognizable federal claim it does not qualify for habeas relief.

Accordingly, the state court decision was neither contrary to, nor an unreasonable application of federal law. Neither Petitioner nor the Court's research has revealed any Supreme Court precedent which holds that a failure to permit expert testimony on the protocol for interviewing child sex abuse victims is constitutional error. Likewise, the Court's research did not reveal any "legal principles and standards flowing from Supreme Court precedent," *Lakin v. Stine*, 431 F.3d 959, 961 (6th Cir. 2005), which requires a finding of constitutional error if an expert's testimony on the protocol for interviewing child sex abuse victims is excluded.

Accordingly, until there is a definitive, contrary Supreme Court ruling on this issue, the Court concludes that the standards and principles flowing from Supreme Court precedent does not render the exclusion of the expert testimony constitutional error. Thus,

---

[9]     Although it is unnecessary for the Court to decide whether the expert testimony "bears persuasive assurances of trustworthiness," *Turpin v. Kassulke*, 26 F.3d at 1396, the Court does observe that although Dr. Bernet testified he was familiar with the research that many people have done on interview technique, it does not appear that he has actually conducted such research. In addition, the Court notes that an article Dr. Bernet submitted discusses a child's credibility and warns that the criteria for assessing credibility have been based on clinical experience and on limited research, thus they should not be taken to be infallible and later in the article also reveals that "most allegations made by children are true[.]"(Defendant's collective exhibit 2, "Practice Parameters for the Forensic Evaluation of Children and Adolescents Who May Have Been Physically or Sexually Abused,"

20

the state court resolution of this claim was not contrary to, nor an unreasonable application of Supreme Court precedent.

### B.  Ineffective Assistance of Counsel

Petitioner was represented by Attorney Lisa Zavogiannis ("Ms. Zavogiannis") in the trial pertaining to J.P. and by Attorney Phillip Clemons ("Mr. Clemons") in the trial pertaining to N. O.  Petitioner brings claims of ineffective assistance of counsel against each attorney.

Petitioner claims Ms. Zavogiannis rendered ineffective assistance of counsel when she used a diagram of his apartment rather than a photograph.  In addition, he claims Ms. Zavogiannis failed to obtain "transcripts of [sic] grand jury hearing." (Court Doc. No. 1).

Testimony indicates Mr. Clemons was appointed to assist Ms. Zavogiannis during the first trial regarding N.O.'s allegations.  That trial ended in a hung jury.  It appears that after Petitioner was convicted in the trial regarding J.P.'s allegations he became dissatisfied with Ms. Zavogiannis so she was permitted to withdraw as defense counsel, and Mr. Clemons was Petitioner's sole defense counsel for the retrial of the case involving N.O.'s allegations.  Petitioner claims Mr. Clemons never met with him to discuss his case, ignored Petitioner's witness list, elicited inculpatory testimony, and failed to object to leading questions.  The Court will address each claim after a brief discussion of the applicable law.

### 1.  Applicable Law

To obtain habeas corpus relief, Petitioner must show the state court's adjudication resulted in a decision that involved an unreasonable application of clearly established Federal law as determined by the United States Supreme Court.  28 U.S.C. § 2254(d)(1). As the Sixth Circuit has observed, "a federal court may not grant a writ of habeas corpus

21

'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable.'" *Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)),. *cert. denied*, 540 U.S. 1164 (2004). Furthermore, federal courts must defer to state court factual findings, according them a presumption of correctness that the petitioner may rebut only with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established the criteria for determining whether a Sixth Amendment claim of ineffective assistance of counsel is meritorious. The *Strickland* test requires that a defendant demonstrate two essential elements: (1) counsel's performance was deficient, *i.e.*, counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment, and (2) counsel's deficient performance prejudiced the defense, *i.e.*, deprived the defendant of a fair trial rendering the outcome of the trial unreliable. *Id.* at 687-88.

There is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance and that conduct cannot be viewed in hindsight, but must be evaluated for reasonableness within the context of the circumstances at the time of the alleged errors. *Strickland*, 466 U.S. at 689-90. A defendant's challenge to such decisions must overcome a presumption that the challenged actions might be considered sound trial strategy. *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).

To establish the prejudice prong, Petitioner must show that absent his attorney's errors, there is a reasonable probability that the result of his trial would have been different.

Case 4:08-cv-00059-HSM-SKL   Document 14   Filed 09/29/09   Page 22 of 41   PageID #: 103

*Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991). "[R]eviewing court[s] must remember that 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Wong v. Money*, 142 F.3d 313, 319 (6th Cir. 1998), (quoting *Strickland v. Washington*, 466 U.S. at 690). "An error of counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment." *Id.* at 691.

      *2.*    Claims Against Ms. Zavogiannis

      *a.*    <u>Failure to Photograph Apartment</u>

Petitioner first contends that Ms. Zavogiannis was ineffective for failing to use photographs of his apartment rather than a diagram. According to Petitioner, "photographs of the actual view and angle that corresponded with the accusing witness's testimony . . . " would have impeached the accusing witness (Court File No. 1).

At the post conviction hearing Ms. Zavogiannis testified that she went to the apartment complex many times and took pictures. She had her husband measure the rooms for her so that she could attempt to re-create the scene and had a witness, Mr. Modglin, prepare a diagram of what the apartment looked like on the day of the incident. Ms. Zavogiannis was unable to photograph Petitioner's apartment as it was on the day of the incident because she was appointed approximately one year after the incident. At that time, Petitioner no longer resided in his apartment, which was under construction, and counsel did not have access to anything that would show Petitioner's apartment and the location of his furniture and belongings as they were on the date of the incident [Addendum

23

No. V. Vol., III, pp. 43-44].

The state courts concluded counsel was not deficient for using a diagram. Due to counsel's late appointment, she was unable to photograph Petitioner's actual apartment because it was under construction and his belongings were no longer in it. The state introduced pictures of Petitioner's apartment that were taken within a couple of days of the incident. Counsel vigorously cross examined N.O. about her location when she viewed the abuse of J.P. In addition, counsel presented Joe Modglin ("Mr. Modglin"), who drew the diagram of Petitioner's apartment, had been to Petitioner's apartment to visit him on several occasions, and had moved Petitioner's belongings out of this apartment. Mr. Modglin explained that Petitioner had computers and a table behind his bedroom door, thus preventing it from opening completely. Specifically, he explained that when you walked into the bedroom, "you would have to sidestep into the door." [Addenedum No. 1, Vol. III, pp. 187-190]. Mr. Modglin further testified that a person would be unable to stand at the couch and see what was going on in the bedroom because the bedroom door barely opened. In Mr. Modglin's opinion, a person would have stand in the bedroom doorway to see what was going on in the bedroom [Addendum No. 1, Vol. III, p. 190].

During post-conviction proceedings Petitioner did not present any evidence demonstrating how he was prejudiced by counsel's decision to have Mr. Modglin draw a diagram and testify about the interior of his apartment rather than using photographs. There is no proof in the record that Petitioner's belongings were available to recreate the interior of his apartment as it was on the date of the incident. Moreover, Petitioner has not presented any credible evidence that a picture would have revealed anything different than what was presented to the jury.

24

Diagrams, pictures, and descriptions of the apartment were presented at trial and Petitioner has not presented any credible evidence that the diagrams, pictures, and descriptions were inaccurate. Given that this evidence was presented at trial, and there is no evidence demonstrating Petitioner was prejudiced by the failure to introduce photographs, the Court is unable to conclude that there is a reasonable probability that photographs of the apartment would have made a difference in the in the outcome of the trial. Therefore, Petitioner has not demonstrated any prejudice, thus he has not demonstrated ineffective assistance of counsel. Accordingly, the state court's resolution of this claim was not contrary to, nor an unreasonable application of *Strickland*; hence, Petitioner is not entitled to any habeas relief on his claim that counsel was ineffective for using a diagram of his apartment instead of photographs.

### b. *Failure to Obtain Grand Jury Transcripts*

Petitioner also contends counsel failed to obtain the victims' grand jury testimony. Ms. Zavogiannis testified that when she requested the grand jury testimony the State told her there were no grand jury transcripts available. Petitioner asserts counsel should have used Tennessee Rule of Criminal Procedure 6(k)(2), an exception to rule of the grand jury secrecy, to obtain testimony. Petitioner did not present the grand jury testimony during his post-conviction proceeding or produce any proof that such testimony exists. The state courts concluded he was not entitled to any relief on this issue.

There is nothing in the record that reflects the victims testified before the grand jury. Petitioner has not presented a transcript of the grand jury testimony or any other evidence indicating the victims made prior inconsistent statements before the grand jury. Nevertheless, even assuming the victims testified before the grand jury and that Ms.

25

Zavogiannis could have obtained the grand jury testimony, Petitioner has not demonstrated the testimony before the grand jury would have had an impact on the ultimate outcome of his trial. Consequently, in the absence of demonstrable prejudice there can be no constitutional violation of his right to effective assistance of counsel. Accordingly, the state courts' rejection of this claim was neither contrary to, nor an unreasonable application of the *Strickland* standard. This claim, therefore, is without merit.

       3.      Claims Against Mr. Clemons

          a.    <u>*Failure to Confer Prior to Trial*</u>

Petitioner contends that Mr. Clemons was ineffective for failing to confer with him during the interim almost two year period after the mistrial of the case pertaining to N.O. and prior to the retrial of that case. The record reflects that the mistrial occurred on December 3, 2002 [Addendum No. II, Vol. I, p. 58], and the retrial began on September 24, 2004 [Addendum No. II, Vol. II, p. 3]. Although Petitioner acknowledges that counsel assisted in the first trial which resulted in a hung jury and wrote him at least three letters during the interim, he claims that after being appointed as sole counsel in the N.O. case, counsel had no personal contact with him until the day of trial.[10]

          i.    *Background*

Petitioner, who was apparently housed in a state penitentiary outside of Warren County where the trial was conducted, testified during his state post-conviction hearing, "I

---

      [10]     The record reflects that Mr. Clemons was appointed to represent Petitioner on appeal on March 20, 2005, *nunc pro tunc* to December 1, 2004 [Addendum No. II, Vol. I, p. 126]. In addition, the record reflects the trial was held, and Mr. Clemons' office was located, in Warren County, McMinnville, Tennessee and during the interim Petitioner was serving his other state sentence at "Turney Center or Only [Tennessee] or some place [other than McMinnville]." [Addendum No. V., Vol. III, p. 50].

never met with my attorney or spoke to him until several letters [sic]. I think three letters is all I received and I never discussed the case. I did not . . . [meet] him until - - about the case until I walked in the door for my trial." [Addendum No. V, Vol. III, p. 16]. Petitioner further testified he "[n]ever had any counsel, no meetings, even though they called me down here early for my trial. I was here the day before or two days before my trial." (Addendum No. V, Vol. III, p. 16].

Although Petitioner testified he received at least three letters from counsel, the record reflects Petitioner wrote Mr. Clemons a letter on September 7, 2004, telling him his pant size; acknowledging counsel was not going to see him prior to trial; noting that certain arrangements should be made to transport him to court; and voicing his concern about the witness list, the denial of his expert witness, and the failure of the state to video tape the interview with the victims [Addendum No. V, Vol., II, p. 18]. In addition, the record includes two letters from counsel and another letter from Petitioner to counsel, all of which were written subsequent to the instant conviction [Addendum No. V, Vol., II, p. 19-21].

On cross examination, Petitioner conceded that Mr. Clemons assisted Ms. Zavogiannis in the first trial of this case which resulted in a mistrial, assisted her in the investigation of the case, was present at the initial trial, visited Petitioner at the jail, discussed the video tape, and was very familiar with the facts of the case after sitting through the case which resulted in a hung jury. Petitioner admitted that Mr. Clemons met with him at the Warren County Jail in preparation of the trial that ended in a mistrial, but argued those meetings pertained to preparing for the trial which resulted in a hung jury and counsel failed to meet with him at all prior to the retrial [Addendum No. V, Vol. III, pp. 19-22].

Ms. Zavogiannis testified Mr. Clemons assisted her in the trial which resulted in a hung jury. Specifically, she testified Mr. Clemons went with her to the jail to meet with Petitioner and that the three of them discussed the facts of the case in preparing for trial. Ms. Zavogiannis investigated the case, talked with witnesses, had transcripts of the victim's statements from DCS, preliminary hearing tapes, preliminary hearing transcript, and Petitioner's video-taped statement, all of which she discussed with Mr. Clemons. After she was relieved from Petitioner's case, she again reviewed the case with Mr. Clemons and when asked if she shared the results of her investigation and gave everything to him she responded,

> Yes, I did. Gave him access to my file to review all the transcripts, all the prior statements, everything I had plus discussed the matter and told him what I thought was good and bad and things of that nature in the case, tried to help him as much as possible.

[Addendum No. V, Vol. III, p. 42].

Mr. Clemons testified he and Ms. Zavogiannis discussed the possible witnesses and the pros and cons for calling a witness. Mr. Clemons spoke with Ms. Morris, a witness Petitioner wanted presented at this trial, but concluded she would not be helpful [Addendum No. V, Vol. III, p. 48]. When Mr. Clemons was asked to respond to Petitioner's allegation that counsel failed to adequately communicate with him, counsel responded:

> Well, I was appointed to assist Mrs. Zavogiannis. We went to the jail. They set up a television and a video machine and we sat and watched that video. I went out there with her on, I know of at least two other occasions, and met with him and talked about trial strategy and talked about things that had went on and this that and the other. Mrs. Zavogiannis and I worked on the case, you know, what kind of questions do we need to ask. I felt like I knew the case. I communicated with Mr. Vermeal through letters because he was, I believe, in Turney Center or Orly or some place and I felt like I knew that case as well as I needed to prepare for it.

[Addendum V, Vol. III, p. 50]. Counsel further testified that he could not recall whether he had met with Petitioner at the jail prior to trial, but agreed with post-conviction counsel that he filed four motions *in limine* prior to trial.[11]

On cross examination Mr. Clemons testified he investigated the case with Ms. Zavogiannis; he and Ms. Zavogiannis met with Petitioner several times in jail, and on one occasion the meeting lasted four or five hours; he knew the witnesses' and victim's testimony and received a copy of the transcript of the hung jury trial; had copies of the interviews with N.O.; had a copy of the preliminary hearing testimony; requested funds to hire Dr. Bernet; and he was prepared to try the case when he tried it [Addendum V, Vol. III, pp. 57-60].

ii. *Analysis*

Both parties and all the state courts proceeded on the assumption that Petitioner's claims are governed by the *Strickland* standard. Petitioner does not argue for application of a different legal standard. However, the Court observes at the outset that counsel's lack of contact with Petitioner prior to the retrial comes perilously close to requiring the rule outlined in *United States v. Cronic*, 466 U.S. 648 (1984). In *Cronic*, a case adjudicated the same day as *Strickland*, the Supreme Court ruled that in certain extreme cases an

_____

[11]     The record reflects Mr. Clemons filed more than four motions. Specifically, he filed a motion requesting the transcript from the mistrial on October 31, 2003; three motions *in limine* (requesting to suppress evidence found in Petitioner's apartment, Petitioner's prior criminal record, and testimony involving prior similar events) on June 22, 2004; and a motion to approve Dr. Bernet as an expert witness and to approve funds to pay his fee on June 24, 2004,[Addendum No. II, Vol. I, pp. 64-73]. In addition, on September 9, 2004, counsel filed an "Objection to Specific Questions From the Prior Testimony of John Thompson" which the Court denied [Addendum No. II, Vol. I, pp. 79-82], and finally, counsel filed a fourth motion *in limine* on September 17, 2004 [Addendum No. II, Vol. I, p. 83].

attorney's failures are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658. Specifically, the Supreme Court "identified three situations implicating the right to counsel that involved circumstances 'so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'" *Bell v. Cone*, 535 U.S. 685, 695 (2002) (quoting *Cronic,* 466 U.S. at 658-59). The three situations where the presumption-of-prejudice analysis is applicable are: (1) a complete denial of counsel at a critical stage; (2) counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and (3) when counsel is placed in circumstances in which competent counsel very likely could not render assistance. *Cronic*, 466 U.S. at 659.

Although *Cronic* itself did not provide a definitive list of what constitutes a "critical stage," in *Bell v. Cone,* 535 U.S. at 695-96, the Supreme Court clarified that the phrase "denotes a step of a criminal proceeding such as arraignment, that held significant consequences for the accused." The Sixth Circuit has concluded that the pre-trial period is also a critical stage. *Mitchell v. Mason,* 325 F.3d 732, 742-43 (6th Cir. 2003) ("Several of the Supreme Court's cases demonstrate that the period between appointment of counsel and the start of trial is indeed a 'critical stage' for Sixth Amendment purposes.") Thus, Petitioner's claims in the instant case fall under the first situation, as the pre-trial stage is a critical stage in criminal proceedings. Had this lack of contact occurred prior to the initial trial, it likely could have been entitled to a presumption of prejudice pursuant to *United States v. Cronic*, on the basis that Petitioner was constructively denied counsel during the critical pretrial stage of his criminal proceedings.

30

Although the Court is troubled by counsel's failure to meet in person with Petitioner during the interim almost two-year period between the mistrial and re-trial, a thorough review of the record has convinced the Court that counsel's failure to spend any time with Petitioner between the time of his mistrial and the start of his retrial—when viewed in light of the time counsel spent with Petitioner prior to the initial trial, the amount of time he spent in preparation and investigation of the initial trial, the motions he filed in preparation of the retrial, and the correspondence prior to the retrial—did not constitute a complete denial of counsel at a critical stage of the proceedings as contemplated by *Cronic*. Counsel had previously investigated the case, attended the initial trial, filed motions in preparation of the retrial, and corresponded with Petitioner between the mistrial and retrial, thus counsel was not completely absent, nor was Petitioner unrepresented, during the critical pre-trial period.

As noted in *Cronic*, "[t]he Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceedings." *Cronic*, 466 U.S. at 659 n. 25. Although counsel failed to have personal contact with Petitioner prior to his retrial, this is not a case where counsel was totally absent or prevented from assisting Petitioner. Indeed, counsel corresponded with Petitioner and filed motions on his behalf in preparation for the retrial. Accordingly, since Petitioner was not denied counsel during a critical stage, *Strickland* provides the applicable standard of review for Petitioner's claim that counsel was ineffective for failing to confer with him prior to the retrial.

Although, counsel was arguably deficient for failing to meet with Petitioner prior to the retrial, the Court need not make a definitive finding on this point because Petitioner has

failed to demonstrate that counsel's lack of personal contact resulted in any prejudice to his trial. Courts may address the performance and prejudice components of the *Strickland* test in any order and is not required to address both components if a petitioner fails to make a sufficient showing of one. *See Strickland*, 466 U.S. at 697.

The state post-conviction court determined that Clemons' lack of visitation with the Petitioner caused it some concern but concluded he failed to demonstrate he suffered any prejudice as a result of contact. In its affirmance of Petitioner's denial of post-conviction relief, the appellate court rejected Petitioner's ineffective assistance of counsel claim, stating they agreed with the post-conviction court's conclusion that, "although Clemons's lack of visitation with the Petitioner certainly left something to be desired, the Petitioner failed to prove he was prejudiced. . . . Clemons assisted Zavogiannis in the first trial, visited the Petitioner in jail a number of times, interviewed witnesses, and discussed trial strategy that was somewhat successful in the first trial. Clemons testified that he felt he had sufficient knowledge to try the second case." *Vermeal v. State*, 2008 WL 2648939, *12. The appellate court, concluding that Petitioner presented no evidence of how Clemons's lack of visitation affected his trial, found that he had not established the second prong of *Strickland.*

This brings the Court to assess whether the Petitioner was prejudiced by counsel's deficient performance. As previously noted, although the Court does not condone such lack of attorney contact during the critical pre-trial stage of a criminal proceeding, the record reflects that counsel prepared the defense of Petitioner's case and attempted to show that N.O.'s statement was not the result of her own narrative rendition of what

32

happened at Petitioner's residence but rather that her statement was tainted as the result of improper interviewing techniques. In addition, counsel thoroughly cross-examined N.O. about her various statements.

Moreover, without showing how more conferences would have resulted in a different result, Petitioner has failed to allege prejudice, thus, he has failed to allege a sufficient ineffective assistance of counsel claim. Petitioner neglects to specify how pre-trial attorney-client meetings and conferences would have effected the outcome of his trial. According, Petitioner has failed to meet his burden of showing that prejudice resulted from trial counsel's failure to personally, physically meet with him prior to the retrial of this matter, thus no habeas relief is warranted.

> b.    *Leading Questions*

In this claim, Petitioner argues counsel failed to object to the prosecutor's leading questions during the examination of N.O. During his state post conviction hearing Petitioner testified he felt the prosecution was directing the victim's testimony and not letting her answer the questions on her own.

Defense counsel testified he believed the prosecutor's leading questions were justified by her young age and that he did not see anything out of the ordinary because of the child's youth. Post-conviction counsel asked defense counsel if he thought the prosecutor improperly led N.O. during the following colloquy:

> Prosecutor:   Did we talk about the fact that I understood that sometimes seven year olds don't tell the truth?
>
> N.O.:  Yes, sir.
>
> Prosecutor:   And that if you hadn't told the truth, the best thing for you to do was to tell me before we came to court that we could take care of it.

33

N.O.:  Yes.

Prosecutor:   Do you believe that?

N.O.:  Yes, sir.

Prosecutor:  I think I said something to you like nobody was going to prosecute a seven year old for lying.

N.O.;  Yes, sir.

[Addendum V, Vol. III, pp. 56-57].  Mr. Clemons testified he did not believe that was improper leading for a seven year old.[12]  That was the extent of questions directed to Mr. Clemons about his failure to object to the prosecutor leading the child victim.

The post-conviction court concluded that counsel's decision not to object to the leading since the witness was a young child was a matter of trial strategy.  The state appellate court agreed stating that "[m]atters of trial strategy will not be second guessed on appeal if they are informed choices based on sound preparation." *Vermeal v. State*, No. M2007-016760CCA-R3-PC, 2008 WL 2648939, *12 (Tenn. Crim. App. July 3, 2008).

Counsel's conduct is presumed to fall within the wide range of competent professional assistance and Petitioner simply has not demonstrated that counsel's failure to object was outside that range of professional assistance.  Counsel's decision not to object to the leading because of the youth of the witness was a strategic decision to which the Court must defer  since the decision was not unreasonable.  Arguably, it is reasonable to decide not to object to certain leading questions in an effort to prevent the jury from concluding the attorney is seeking to hide the truth.  Moreover, oftentimes an objection to

---

[12]     The Court observes that the victim was eleven at the time she testified [Addendum No. II, Vol., II, p. 83].

leading questions will only result in the rewording of the question with the effect of eliciting the same testimony. Furthermore, counsel could have justifiably believed that it was not worth displaying a critical attitude in front of the jury as to these questions for fear of alienating them, especially since the witness was a young child abuse victim.

Accordingly, Petitioner has failed to demonstrate counsel's failure to object to leading questions amounted to deficient performance. Neither Petitioner nor the Court's research has revealed any Supreme Court precedent that establishes that failure to object to the use of leading questions is constitutionally deficient behavior on the part of trial counsel. Therefore, since Petitioner has not demonstrated that the state court decision was contrary to, or an unreasonable application of federal law, he is not entitled to any habeas relief on this claim.

c.    <u>Officer Derwin Adcock's Testimony</u>

During state post-conviction proceedings and on direct appeal of the denial of his post-conviction petition, Petitioner claimed counsel was ineffective at the trial when he presented the investigating officer and asked him what items he had found in Petitioner's apartment because he elicited the very items counsel had previously sought to exclude when he filed a motion *in limine* to exclude evidence found in Petitioner's apartment. Although Petitioner did not include that claim in his § 2254 petition, he did include it in his memorandum in support of his petition. Respondent filed an inadequate response which did not even address all the issues raised in Petitioner's § 2254 petition and the issues it did address where analyzed only in a cursory manner. Nevertheless, even though this claim is not included in the State's response, the Court will address it.

The appellate court concluded that Mr. Clemons testified he had researched the

35

types of items usually found in pedophiles' rooms and through the detective he attempted to elicit testimony that most of those items were not found in the Petitioner's room. The appellate court observed that Mr. Clemons admitted that some of the items found in Petitioner's room, as testified to by the detective, could be considered detrimental to his client's case, but he felt it was a tactical decision. Thus, the appellate court concluded, "[t]hese types of decision will not be overturned on post-conviction." *Vermeal v. State*, 2008 WL 2648939, *12.

A review of the trial transcript reveals that Mr. Clemons presented two defense witnesses. One was Officer Adcock, the investigating officer. When Mr. Clemons attempted to elicit testimony from Officer Adcock as to some of the traits of a pedophile, the prosecution objected. Defense counsel then proceeded to ask the officer what he found in Petitioner's residence. The officer had found the popsicles, a child's book, children's clothing, and what was described as a video intended for children [Addendum No. II, Vol. III, pp. 217-231]. The only information counsel elicited from the officer that was not found in Petitioner's apartment was forensic evidence or the victim's hair.

The Court is troubled with the state court's resolution of this claim. Although it does appear that counsel had a strategy to elicit testimony about the types of items usually found in a pedophile's room and then show that Petitioner did not have those items, he did not execute that strategy. Once the prosecution objected to his question to Officer Alcock inquiring about the traits of a pedophile and the Court, in effect, sustained the objection, that strategy was no longer available to the defense unless counsel asked the officer whether each item that counsel had determined was normally found in a pedophiles residence was located in Petitioner's. But if he had proceeded in that manner, the

36

prosecution would likely have elicited testimony as to the items that were found. Therefore, counsel should have abandoned this strategy since he was unable to demonstrate Petitioner did not possess items normally possessed by pedophiles. Instead, for some inexplicable reason, counsel asked the officer what he found in Petitioner's apartment. The only items which the officer testified were found in Petitioner's apartment, *i.e.*, a child's book, children's clothes, and a child's video proved damaging to Petitioner. Indeed, the prosecution elicited testimony that Petitioner did not have any children living with him and then in closing, in addition to arguing that Petitioner, a 50 year old man who lives alone opens his apartment up to children between the ages of seven and eleven, enticing them into his apartment with popsicles, letting them watch his television, and jump on his bed like a trampoline, he also highlighted the fact that Petitioner did not have any children but did have a child's book, a child's video, and children's clothing in his apartment [Addendum No. II, Vol. III, p. 241].

Needless to say, reviewing the circumstances of this case in hindsight, it does not appear that counsel's performance in this respect amounted to reasonable trial strategy. Nevertheless, the Court need not make a definite ruling with respect to counsel's performance because, even assuming that the state court's finding of no deficient performance was an objectively unreasonable application of *Strickland*, this Court is unable to find prejudice. This is so because there is no proof that the exclusion of Officer Adcock's testimony would have negatively impacted N.O.'s credibility.

Petitioner's conviction was the result of the jury crediting N.O.'s testimony, as that was the only proof that the abuse occurred. However, there was no question that N.O. and J.P., two young girls, were in Petitioner's apartment with him at the time of the alleged

incident. There is no evidence contradicting that fact or the fact that he gave them popsicles and permission to come into his apartment, watch cartoons on Nickelodeon, and jump on his waterbed. To the extent that the child's book, video, and clothing would have supported N.O.'s credibility, the same can be said about the popsicles and permitting children to watch cartoons and jump on a waterbed. Accordingly, the Court is unable to concluded that, but for Officer Adcock's testimony, there is a reasonable probability that the jury would have reached a different result; thus, the Court's confidence in the outcome is not undermined. No habeas relief is warranted on this claim.

### d. *Failure to Call Two Witnesses*

Finally, Petitioner complains that defense counsel failed to call two witnesses, *i.e.*, Martha Morris ("Ms. Morris") and Charles Ikeard ("Mr. Ikeard"). Counsel did not recall Petitioner indicating he wanted Ms. Morris subpoenaed to testify on his behalf. Nevertheless, counsel testified that at some point he spoke with Ms. Morris and he and Mrs. Zavogiannis concluded Ms. Morris would not be helpful to the defense. Although Ms. Morris would have testified that other children visited Petitioner's apartment on other occasions and he would give them popsicles and have cook-outs, Ms. Morris never told counsel that she had seen the victims in this case over at Petitioner's apartment on previous occasions. Counsel did present Ms. Morris during sentencing, but did not present her during trial because of fear that she would assert other children felt safe around him and no other complaints had been made, which would have allowed the District Attorney's Office to bring in other girls who apparently would make similar allegations.

During the post-conviction hearing Ms. Morris testified she saw the two victims in this case at the Petitioner's apartment the week prior to this incident. However, on cross-

38

examination, Ms. Morris was unable to identify the girls to whom she was referring by name and stated they were small, dark-headed "eight and nine year old, eight and ten year old girls." [Addendum No. V, Vol. III, p. 64]. In addition, Ms. Morris admitted she had not told defense counsel that she saw these two girls at Petitioner's apartment the week before this incident, rather she had "just referred to as [sic] children." [Addendum, No. V. Vol. III, pp. 64-68].

Although the post-conviction record does not include any evidence of the content of Mr. Ikeard's proposed testimony, defense counsel testified he did not call him because he was aware he had three prior felony convictions and that "the State would key in on that." [Addendum No. V, Vol. III, pp. 59-60].

The state appellate court concluded Clemons could have reasonably determined "any benefit of Ms. Morris's testimony would be outweighed by the possibility of negative consequences of opening the door to additional character witnesses." Similarly, the appellate court concluded defense counsel "could reasonably determine that A.J. Ikeard's criminal past would render the credibility of his testimony suspect in the eyes of the jury and thus cloud the Petitioner's case." Finding both matters were trial strategy, the appellate court denied relief. *Vermeal v. State*, 2008 WL 2648939, *12.

Defense counsel's reasons for refusing to call these two witnesses are not objectively unreasonable. Ms. Morris testified she never told either of Petitioner's defense counsel that she had seen the two victims in this case over at Petitioner's residence prior to the incident in question. The Court observes, however, that she testified on cross-examination during sentencing that she had previously seen N.O. at Petitioner's apartment at a barbeque and she saw N.O. jump on the waterbed [Addendum No. II, Vol. V, p. 14].

39

In addition, counsel stated he chose not to call Ms. Morris as a witness because her testimony could have opened the door to inculpatory evidence. Counsel's strategic decision is supported by Ms. Morris' sentencing hearing testimony. On cross-examination Ms. Morris began rambling about how well she knew N.O. and how often she came by Petitioner's apartment and that he had barbeques for the neighborhood children "because the children that didn't have - - the children in the neighborhood, a lot of their parents worked, a lot of them just let them run wild and he did things for the children to let them have something." [Addendum No. II, Vol. V, pp. 13-16]. Consequently, the Court is unable to conclude counsel's strategic decision was deficient. Nevertheless, even if counsel was deficient for failing to present Ms. Morris, Petitioner has not demonstrated he suffered any prejudice. Thus, the Court is unable to concluded that if counsel had presented Ms. Morris that there is a reasonable probability that the outcome of the trial would have been different. Thus, the claim is without merit.

Petitioner's claim that counsel rendered ineffective assistance by failing to call Mr. Ikeard as a witness is also without merit. The state post-conviction hearing established that Mr. Ikeard had prior felony convictions, thus he would have been subject to impeachment. Petitioner has not overcome the strong presumption that counsel's failure to call Mr. Ikeard was a sound tactical decision. *Strickland*, 466 U.S. at 687-90. Thus, the state court's denial of this claim was neither contrary to, nor an unreasonable application of federal law.

40

## V. CONCLUSION

Having thoroughly considered both parties' pleadings together with the state court record,  the Court concludes Petitioner has not established a valid claim for ineffective assistance of counsel or any other alleged constitutional violation.  Accordingly, there is no basis on which to grant the writ of habeas corpus; thus, Respondent's motion for summary judgment will be **GRANTED** on all claims (Court Doc. No. 7) and Petitioner's habeas petition will be **DISMISSED** (Court Doc. No. 1).

An appropriate judgment will enter.

IT IS SO ORDERED.

_____*/s/Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE